Russel D. Myrick (CA Bar No. 270803)
ARENDSEN BRADDOCK LLP
535 N. Highway 101, Suite A
Solana Beach, CA 92075
Phone: 858-248-6370
Email: russel@abinjury.com
*[Pro Hac Vice application pending]*

Michael J. Green (HI Bar No. 4451)
841 Bishop Street, Suite 2201
Honolulu, HI 96813
Telephone: 808-521-3336
Facsimile: 808-566-0347
Email: michael@michaeljaygreen.com

Attorneys for Plaintiffs
ORVILLE DELEON AND
DEANNE ZIADE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ORVILLE DELEON, DEANNE ZIADE,<br><br>  Plaintiffs,<br><br>v.<br><br>STARWOOD HOTELS & RESORTS WORLWIDE, LLC., SH GROUP HOTELS & RESIDENCES U.S., LLC., SOF-XI KAUAI PV HOTEL, L.P., SOF-XI KAUAI PV GOLF., L.P.,<br><br>  Defendants. | Case No.<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

This civil action arises from Defendants' negligent, reckless, and unlawful conduct that resulted in the violent assault of Plaintiff Orville Deleon by an intoxicated hotel guest after Defendants overserved alcohol and failed to implement reasonable security measures to protect employees and others on and around the 1 Hotel Hanalei Bay property. Plaintiffs plead and allege as follows:

## I. NATURE OF THE ACTION

1. This is a civil action arising from a violent assault on Deleon after Defendants overserved alcohol to an obviously intoxicated hotel guest, failed to intervene despite clear warning signs of escalating danger on hotel property, including public nudity, shouting profanity, and overt hostility, and failed to provide reasonable security protections for employees shuttled to an unprotected, known-risk parking area at Makai Golf Course.

2. This incident was not an unavoidable or random criminal act; rather, it was the foreseeable result of Defendants' institutional practices of prioritizing alcohol revenue and guest spending over reasonable safety protocols, intervention measures, staffing, and security infrastructure, in violation of Hawai'i laws governing the responsible sale and service of alcohol.

/ / /

2

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred on the island of Kauaʻi, Hawaiʻi.

## III.   PARTIES

5.      Plaintiff ORVILLE DELEON is a resident of Hawaiʻi.

6.      Plaintiff DEANNE ZIADE is a resident of Hawaiʻi.

7.      Defendant STARWOOD HOTELS & RESORTS WORLDWIDE, LLC ("Starwood") is a business entity that owns, controls, manages, operates, and/or franchises the 1 Hotel brand and the subject properties and operations alleged herein.

8.      Defendant SH GROUP HOTELS & RESIDENCES U.S., LLC ("SH Group") is a business entity that owns, manages, operates, and/or controls the 1 Hotel Hanalei Bay property and relevant operations, including guest services, food and beverage operations, and security protocols.

9.      Defendant SOF-XI KAUAI PV HOTEL, L.P. ("Hotel Owner") owns and/or controls the premises known as 1 Hotel Hanalei Bay in

Princeville, Kaua'i.

10. Defendant SOF-XI KAUAI PV GOLF, L.P. ("Golf Owner") owns and/or controls the premises known as Makai Golf Course, including the parking areas utilized by employees and connected to hotel operations.

11. Defendant 1 HOTEL HANALEI BAY ("Hotel") is a resort property in Princeville, Kaua'i, operated and controlled by one or more Defendants.

12. Defendant MAKAI GOLF COURSE ("Makai") is a golf course property in Princeville, Kaua'i, including parking areas used by hotel employees.

13. DOE LIQUOR LICENSEE ENTITY 1 is the entity that held the liquor license and/or employed the bartenders/servers responsible for alcohol service to the assailant on the date of the incident.

14. DOE SECURITY CONTRACTOR ENTITY 2 is the entity that provided security services and/or security staffing to the Hotel and/or Makai premises.

15. DOE SHUTTLE / TRANSPORT ENTITY 3 is the entity responsible for operating or staffing the shuttle route that transported employees between the Hotel and Makai employee parking.

4

16.    DOE INDIVIDUALS 1–25 include, among others, the Hotel's General Manager, Director of Security, Food & Beverage Director, Bar Manager, Risk/Safety Manager, and other managers/supervisors who authorized, ratified, or ignored dangerous overservice and security practices alleged herein.

17.    Plaintiffs are informed and believes and thereon alleges that each Defendant was the agent, employee, joint venturer, alter ego, partner, or representative of each other Defendant and acted within the course and scope of such relationships.

## IV.  FACTUAL ALLEGATIONS

### A. The Hotel's alcohol service and visible intoxication

18.    On or about March 16, 2024, Defendants served substantial amounts of alcohol to hotel guest Keaton Duncan ("Duncan") at the Hotel's bar(s).

19.    Defendant SOF-XI Kauai PV Hotel, L.P., doing business as 1 Hotel Hanalei Bay, and/or related operating entities, held the liquor license for the premises and were responsible for alcohol service to Duncan.

20.    During the hours leading up to the assault, Duncan became visibly intoxicated, loud, erratic, and disinhibited, while in public areas of the Hotel.

21.    Duncan's condition and conduct were apparent to Hotel staff and management, including but not limited to his erratic behavior and impaired state in common areas.

22.    Despite clear signs of intoxication, Defendants' staff continued to allow Duncan to remain on the premises without effective intervention, removal, monitoring, or contacting law enforcement.

**B. The security failures and the path to the Makai parking lot**

23.    Deleon was employed by the Hotel and, after completing his shift, he clocked out and was shuttled as part of Hotel operations to the Makai employee parking area.

24.    Defendants owned, controlled, operated, and/or utilized the Makai parking area for employees and knew employees would be present there when shuttled from the Hotel.

25.    Defendants failed to provide reasonable security protections at the Makai parking area, including adequate staffing, monitoring, lighting, surveillance, and response protocols—despite its use for employee transport and its foreseeable risk profile.

26.    Duncan traveled from the Hotel premises to the Makai parking area and encountered Plaintiff Deleon.

**C. The assault and catastrophic harm**

27. Shortly after leaving the Hotel while intoxicated, Duncan assaulted Plaintiff Deleon at or near the Makai parking area.

28. Plaintiff Deleon suffered severe physical injuries, including permanent facial disfigurement, serious and persistent brain injuries, loss of ability to ambulate, balance issues, and more, resulting in substantial medical care, long-term impairment, loss of earnings, and profound emotional distress.

## V.   PATTERN EVIDENCE AND INSTITUTIONAL NOTICE (OVERSERVICE & RESPONSIBILITY FAILURES)

29. Plaintiffs are informed and believe and thereon alleges that, prior to Plaintiff Deleon's assault, Defendants had longstanding institutional notice of alcohol-related disturbances and unsafe conditions on the property, including recurrent episodes of rowdy intoxication, fights, and incidents requiring security intervention.

30. Plaintiffs are further informed and believes and thereon alleges that Defendants repeatedly failed to implement adequate training, staffing, and intervention protocols for intoxicated or belligerent guests and failed to enforce written policies in practice.

31. Plaintiffs are further informed and believes and thereon alleges that, in a separate incident in September 2023, an overserved guest assaulted a hotel employee, after which management failed to take meaningful remedial

7

action and instead engaged in blame-shifting and retaliation dynamics rather than implementing safety improvements.

32.    Plaintiffs are informed and believes and thereon alleges that Defendants were warned internally and/or by employees about unsafe "blind spot" locations, including areas associated with Makai and related employee parking logistics, and nonetheless failed to implement reasonable measures such as cameras, staffing, and coordinated incident response.

33.    In sum, Defendants' conduct reflects a pattern of prioritizing alcohol revenue and guest spending over employee safety and reasonable protections, despite repeated red flags and foreseeable risk.

## VI. PUNITIVE DAMAGES ALLEGATIONS (PARTICULARIZED)

34.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 33 as though fully set forth herein.

35.    Punitive damages are warranted because Defendants' conduct was willful, wanton, reckless, and undertaken in conscious disregard of the safety and rights of Plaintiff Deleon and other employees and patrons on the premises.

36.    The facts alleged herein demonstrate that Defendants knowingly maintained and encouraged a dangerous alcohol-driven environment on the property, prioritized alcohol-related revenue over basic safety practices, and

8

failed to take reasonable steps to prevent foreseeable harm despite repeated warning signs of escalating risk.

37. From approximately May 2023 through date of assault (and to present), employees repeatedly observed and reported that the hotel was severely understaffed, operating with approximately 325 employees when the operational staffing model required approximately 400 employees to safely operate the resort.

38. Because of this understaffing, managers and supervisors were routinely forced to perform multiple roles simultaneously and were unable to properly supervise alcohol service operations or enforce responsible alcohol service standards.

39. Employees responsible for alcohol service and guest programming during this time period received little to no training regarding responsible alcohol service, intoxicated guest management, or security response protocols.

40. Employees were trained only in limited technical aspects of beverage service, such as opening wine bottles and presenting drinks, but were not trained how to identify intoxicated guests, refuse service to intoxicated persons, or respond to aggressive or disruptive behavior caused by alcohol consumption.

41. During this time even management-level employees report receiving no meaningful alcohol safety training whatsoever despite those responsibilities.

42. During this time, evening guest programming included bonfires, alcohol tasting events, and social gatherings where alcohol consumption was actively and heavily promoted.

43. Employees report the hotel suffering a "identity crisis": on the one hand, attempting to capitalize on societal trends toward health and wellness-focused lifestyles, but on the other hand, a business model still relying heavily on alcohol sales to generate revenue.

44. During this period, employees reported that management, including Food and Beverage Manager Eaton and Assistant Manager Hewitt repeatedly acknowledged that alcohol sales were a primary revenue driver for the hotel, and instructed employees responsible for programming and events were to structure guest experiences in ways that encouraged alcohol consumption.

45. For example, in or about August 2023, the hotel implemented a drink ticket system for alcohol service at large events near the Sandbox pool area, where guests would purchase drink tickets in advance to exchange for

10

alcoholic beverages in order to increase efficiency and maximize beverage sales.

46.     That drink ticket system was explained to staff by the hotel's Food and Beverage Manager Eaton in or about August 2023 as part of the hotel's effort to increase alcohol sales at high-volume guest events.

47.     During this time, the hotel hosted numerous alcohol-centered events including Night Market events, Full Moon Party events near the Sandbox pool area, and previously DJ nights at Welina Terrace, all of which promoted significant alcohol consumption and drew both hotel guests and members of the public onto the property.

48.     A management meeting was held in November 2023 in a meeting room located on the eighth-floor corridor near the HR offices and employee cafeteria, where management (Alexa Eaton, Ikaika Hewitt and Nicholas Gold) discussed alcohol-related concerns associated with those events.

49.     During that meeting, the hotel's Loss Prevention Manager Okami warned managers that law enforcement and Hawaiʻi Alcoholic Beverage Control authorities had already raised concerns about overserving alcohol on the property, demonstrating that management was aware of the risks associated with excessive alcohol service.

50.    Despite these warnings, Defendants continued to promote alcohol-centered events and nightlife programming designed to maximize beverage sales out of financial necessity.

51.    During this same time period, employees reported repeated incidents involving intoxicated guests behaving aggressively or disruptively on hotel property.

52.    One such incident occurred during a DJ event at Welina Terrace prior to 2024, when a fight broke out between two intoxicated local patrons who had been heavily overserved on the property.

53.    That incident was sufficiently serious that management ultimately discontinued DJ events at that location.

54.    Another alcohol-related incident occurred during the Night Market events in 2023, where employees observed intoxicated guests harassing staff members and other patrons.

55.    During this time, employees also reported concerns that intoxicated guests frequently congregated in areas of the property that lacked adequate security supervision.

56.    Despite these incidents, management failed to implement meaningful corrective measures to address alcohol-related risks.

57.     Employees also observed alcohol being left unattended in areas accessible to guests without bartender supervision, including occasions where bottles of liquor and shot glasses were placed on beverage carts for guest access without continuous employee monitoring.

58.     Employees further observed situations where partially consumed alcohol bottles from in-room dining trays were left in public areas or hallways for extended periods of time without supervision.

59.     These conditions created opportunities for guests, employees, and even children to access alcohol without meaningful oversight.

60.     Employees also reported internal theft of alcohol by overnight staff and third-party workers, further demonstrating the absence of proper alcohol control procedures.

61.     Employees additionally reported that intoxicated guests were sometimes permitted to leave the hotel premises and operate vehicles while visibly impaired.

62.     In several instances reported by employees during this timeframe, an intoxicated guest was handed his car keys and allowed to leave the property without staff arranging a taxi or other transportation.

63.     One of these guests subsequently caused a vehicle accident.

64.     In another incident, an intoxicated guest assaulted an employee by physically threatening her and accosting her, causing her severe mental anguish and anxiety that resulted in her going on long-term disability.

65.     These incidents were known to hotel management and security personnel, including Nicholas Gold, Alexis Eaton, Ikaika Hewitt, and Moki Okami, among others.

66.     Throughout this time, employees repeatedly raised concerns about intoxicated guests accosting or harassing staff members working in guest-facing roles.

67.     These concerns were raised by front office employees including staff members identified as Amanda Reali and China Price, among others.

68.     These concerns were discussed among employees and communicated to supervisors and management personnel.

69.     Management nonetheless failed to implement adequate alcohol service training or security procedures in response to these concerns.

70.     At the same time, hotel employees were required to park their vehicles at the Makai Golf Course parking lot, located approximately one mile from the hotel, and were transported between the hotel and that location by employee shuttle.

71.     Approximately 300 employees used this shuttle system daily, resulting in employees losing approximately 40 minutes per day of unpaid time commuting between the hotel and the parking location.

72.     Employees repeatedly expressed concerns about safety conditions at the Makai parking lot, including poor lighting and lack of security presence.

73.     These concerns were known to hotel management and the hotel's Loss Prevention Manager Okami, and general manager Nicholas Gold.

74.     Management discussed the possibility of providing security coverage or installing safety infrastructure at the Makai parking lot; however, management ultimately decided not to provide security personnel at that location, in part because of the financial cost associated with staffing the area.

75.     Management also expressed concerns that providing security presence at the location would create additional liability exposure if the hotel assumed responsibility for that area, due to the time-lag between the hotel and the parking lot being around 20 minutes.

76.     These statements were made by Nicholas Gold and Moki Okami during staff meetings in the meetings rooms adjacent to the cafeteria level in late 2023.

77.     As a result of this decision, the Makai parking lot remained a known security "blind spot" despite management's knowledge that intoxicated guests leaving hotel bars and events frequently traveled through that same area.

78.     Management further knew that employees leaving their shifts would encounter intoxicated guests in the same location and during the same time periods when bar service ended.

79.     By knowingly maintaining an alcohol-centered environment while simultaneously failing to implement basic security measures in known risk areas, Defendants demonstrated reckless disregard for the safety of employees including Plaintiff Deleon.

80.     Defendants' conduct was not an isolated lapse but rather the product of systemic decisions to prioritize alcohol revenue and operational cost savings over employee safety.

81.     Defendants knowingly profited from alcohol sales and alcohol-centered programming while consciously disregarding the foreseeable risks associated with overservice, intoxicated guests, and inadequate security.

82.     The violent assault on Plaintiff Deleon was therefore a foreseeable and preventable consequence of Defendants' institutional practices and deliberate failure to address known alcohol-related risks.

16

83.     Plaintiffs are informed and believe, and based thereon allege, that Defendants' failure to implement adequate alcohol service controls, security staffing, training, and safety measures was not the result of oversight or mistake but rather the product of conscious management decisions balancing operational costs and potential liability exposure against guest spending and alcohol revenue.

84.     Despite knowledge of repeated alcohol-related incidents, employee safety concerns, and warnings from security personnel and law enforcement authorities regarding overservice practices, Defendants chose to continue operating the property with inadequate staffing, insufficient training, and known security gaps in order to minimize expenses and preserve alcohol-related profits.

85.     Such deliberate disregard of known risks to employees and patrons constitutes willful and reckless conduct warranting the imposition of punitive damages.

86.     Plaintiffs are therefore entitled to recover punitive damages in an amount sufficient to punish Defendants for their reckless disregard of safety and to deter similar misconduct in the future.

/ / /

/ / /

## VII. HAWAI'I WORKERS' COMPENSATION LAW

87. The circumstances of the assault fall outside the scope of Hawai'i's workers' compensation exclusivity provisions.

88. Hawai'i workers' compensation applies only to injuries arising "out of and in the course of employment." See Haw. Rev. Stat. § 386-3.

89. Under the well-recognized "going and coming rule," injuries sustained while an employee is traveling to or from work after completing a shift ordinarily fall outside the workers' compensation system.

90. At the time of the incident, Plaintiff Deleon had completed his shift at the 1 Hotel Hanalei Bay and was no longer performing job duties for Defendants.

91. Plaintiff Deleon had clocked out and was traveling home.

92. As part of the hotel's operational logistics, employees were transported by shuttle from the hotel premises to an overflow employee parking area located at the Makai Golf Course parking lot, approximately one mile from the hotel.

93. The Makai parking lot is owned, operated, and controlled by entities affiliated with Defendants but is not part of Plaintiff Deleon's workplace or job site.

18

94.    The lot functions as an off-site parking and transit location where employees retrieve their personal vehicles after completing their shifts.

95.    At the time of the assault, Plaintiff Deleon had disembarked from the shuttle and was leaving the area to travel home.

96.    Because Plaintiff Deleon had concluded his employment duties and was commuting home, his injuries did not arise in the course of employment.

97.    The incident therefore falls squarely within the going and coming rule, which excludes such injuries from Hawai'i's workers' compensation scheme.

98.    The assault was committed by a third party who was not an employee of Plaintiff Deleon's employer.

99.    The attack was unrelated to Plaintiff Deleon's employment duties.

100.    The assault resulted from Defendants' negligent and reckless overservice of alcohol and their failure to implement reasonable security and safety measures on property under their ownership and control.

101.    These facts create a third-party tort claim independent of the employment relationship.

102. Hawai'i's workers' compensation exclusivity provisions therefore do not bar Plaintiff Deleon's claims.

103. The "parking lot" or "employer-controlled premises" exceptions do not apply under the circumstances alleged here, as these exceptions apply only where an employee is injured in a parking facility that constitutes an integral part of the employer's work premises.

104. The Makai parking lot is not part of the 1 Hotel workplace and is physically separate from the hotel property by approximately one mile.

105. Employees perform no work duties at that location.

106. The lot is not integrated into the operational worksite; rather, it functions as a remote overflow parking area shared with members of the public and guests.

107. Plaintiff Deleon had completed his work duties, left the hotel premises, and been transported away from the workplace by shuttle.

108. At the time of the incident, Plaintiff Deleon was engaged in the personal act of retrieving his vehicle in order to travel home.

109. Under these circumstances, Plaintiff Deleon was engaged in ordinary post-work commuting activity.

110. The "special hazard" or "employer-created risk" doctrines only where the employee's presence at a location is required by the employer and

the hazard arises directly from the employment relationship.

111.   Here, the hazard was not a risk inherent in Plaintiff Deleon's employment; the hazard was the violent criminal conduct of an intoxicated hotel guest who Defendants had overserved alcohol to.

112.   The risk arose from Defendants' negligent alcohol service practices and their failure to provide reasonable security; and the danger therefore arose from Defendants' negligent operation of their hospitality and alcohol service operations.

113.   Plaintiff Deleon's injuries were caused by Defendants' independent negligence as property owners and alcohol vendors.

114.   Hawai'i's workers' compensation statute therefore does not preclude Plaintiff Deleon from pursuing full tort damages in this action.

## VII.   CLAIMS FOR RELIEF

### COUNT I
NEGLIGENCE / PREMISES LIABILITY

115.   Plaintiffs reallege paragraphs 1–76.

116.   Defendants owed Plaintiff Deleon a duty to exercise reasonable care to provide a safe workplace and safe premises, and to protect against foreseeable criminal acts by third parties.

117.   Defendants breached that duty as alleged.

118.   Defendants' breaches were a legal cause of Plaintiffs' damages.

## COUNT II
NEGLIGENT SECURITY

119.    Plaintiffs reallege paragraphs 1–76.

120.    Defendants had a duty to provide reasonable security measures given the foreseeable risks of intoxication-related misconduct and violence.

121.    Defendants failed to provide reasonable security and failed to intervene after notice of danger.

122.    This failure was a substantial factor in causing Plaintiffs' harm.

## COUNT III
NEGLIGENCE PER SE (UNLAWFUL SERVICE OF ALCOHOL)

123.    Plaintiffs reallege paragraphs 1–76.

124.    Hawai'i law prohibits furnishing alcohol to a visibly intoxicated person (including under HRS § 281-78 and related regulations).

125.    Defendants violated these statutory duties by serving alcohol to Duncan while he was visibly intoxicated.

126.    The violations were a substantial factor in causing Plaintiffs' injuries.

127.    Plaintiffs belong to the class of persons the statutes were designed to protect and suffer the type of harm they were intended to prevent.

## COUNT IV
NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION

128.    Plaintiffs reallege paragraphs 1–76.

22

129.   Defendants negligently hired, trained, supervised, and/or retained staff responsible for alcohol service and security response, including failure to train employees on intervention with intoxicated/belligerent guests and failure to enforce service cut-off rules.

130.   This negligence was a substantial factor in causing Plaintiffs' injuries.

## COUNT V
### VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

131.   Plaintiffs reallege paragraphs 1–78.

132.   The acts and omissions of Defendants' employees were committed within the course and scope of their employment.

133.   Defendants are vicariously liable.

## COUNT VI
### LOSS OF CONSORTIUM
(Plaintiff Deanne Ziade only against All Defendants)

134.   Plaintiff Deanne Ziade, the lawful spouse of Plaintiff Orville Deleon, realleges and incorporates by reference paragraphs 1 through 78 as though fully set forth herein.

135.   At all relevant times, Plaintiffs Orville Deleon and Deanne Ziade were husband and wife and maintained a close marital relationship characterized by companionship, affection, emotional support, and shared family life.

23

136. As a direct and proximate result of the violent assault on Plaintiff Orville Deleon and the severe injuries he sustained, including traumatic brain injury and resulting cognitive and personality changes, Plaintiff Deanne Ziade has suffered and continues to suffer significant damages to the marital relationship.

137. These damages include, but are not limited to, the loss or impairment of her husband's companionship, society, affection, emotional support, assistance in household and family responsibilities, and the loss or substantial alteration of the marital relationship as it existed prior to the incident.

138. Plaintiff Deanne Ziade has also experienced emotional distress and the loss of the benefits of a normal marital relationship due to the physical, cognitive, and behavioral changes suffered by her husband as a result of the injuries caused by Defendants' conduct.

139. The injuries to Plaintiff Deleon have significantly affected his ability to participate in family life, communicate and interact as he did prior to the incident, and maintain the same level of companionship and partnership within the marriage.

140. As a direct and proximate result of Defendants' negligent, reckless, and wrongful conduct as alleged herein, Plaintiff Ziade has suffered

loss of consortium damages in an amount to be proven at trial.

141. Plaintiff Deanne Ziade is entitled to recover all damages permitted under Hawai'i law, including those recognized under Haw. Rev. Stat. § 663-8.9, together with all other relief the Court deems just and proper.

## IX. DAMAGES

142. Plaintiffs seek all compensatory damages, including past and future medical expenses, loss of earnings and earning capacity, pain and suffering, emotional distress, loss of enjoyment of life, and all other damages to be proven at trial.

143. Plaintiffs also seek punitive damages against the appropriate Defendants based on the willful/wanton and conscious-disregard conduct alleged above.

## X. PRAYER FOR RELIEF

Plaintiffs request judgment against Defendants, jointly and severally, for:

A. General, special, and compensatory damages according to proof;

B. Punitive damages according to proof;

C. Costs of suit and allowable attorneys' fees where permitted;

D. Pre- and post-judgment interest as allowed;

E. Such other relief as the Court deems just and proper.

## XI. JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

DATED: March 12, 2026

Respectfully submitted,


/s/ Michael J. Green
Michael J. Green

Attorney for Plaintiffs
ORVILLE DELEON AND
DEANNE ZIADE.

26